# EXHIBIT 8



BRENNAN INSTITUTE
*for*
MIND-BODY HEALING

### Psychosexual Risk Assessment

| | |
|---|---|
| Client: | Shaun Jason Marvin |
| Date of Birth: | ▓▓▓▓▓▓ |
| Age at Assessment: | 43 years, 7 months |
| Dates of Assessment: | 06/29/2022, 07/27/2022 |
| Date of Report: | 09/23/2022 |
| Evaluator: | Darren C. Brennan, PsyD, CSOTP |

*Please note Mr. Marvin's background history was based on his self-report, which was corroborated by collateral reports, as well as by medical and Court records. This report is subject to be amended if additional information comes to light.*

### Sources of Information
- Clinical Interviews with Mr. Shaun J. Marvin
- Collateral Teleconference Interview with Mr. Marvin's mother, Ms. Georgia Marvin
- Collateral Teleconference Interview with Mr. Marvin's fiancé, Ms. Kristi Lang
- Telephone Consultation with Mr. Marvin's attorney, Mr. Edward J. Ungvarsky, Esq.
- Minnesota Multiphasic Personality Inventory-2 (MMPI-2)
- Millon Clinical Multiaxial Inventory, 4th Edition (MCMI-IV)
- Trauma Symptom Inventory-2 (TSI-2)
- Children, Internet and Sex Cognitions Scale (CISC)
- Adverse Childhood Experience (ACE) Questionnaire
- Ask Suicide-Screening Questions (ASQ)
- Child Pornography Offender Risk Tool (CPORT): Version 2
- STABLE-2007 Dynamic Risk Instrument
- Post-Deployment Health Assessment (DD Form 2796) for Mr. Shaun J. Marvin, by Ms. Karen Likins, dated 02/24/2004
- Medical Record for Mr. Shaun J. Marvin, by Mark T. Sisson, MD., Dwight D. Eisenhower U.S. Army Medical Center (AMC), Connelly Health Clinic, Ft. Gordon, GA, dated 05/09/2005
- Medical Record for Mr. Shaun J. Marvin, by George T. Cassidy, PA-C., Dwight D. Eisenhower U.S. AMC, Connelly AD Sick Call, Ft. Gordon, GA, dated 05/11/2005
- Behavioral Health Evaluation for Mr. Shaun J. Marvin, by Theresa K. Kulikowski, P.A., Evans Army Community Hospital (ACH), Outpatient Mental Health Department, Ft. Carson, CO, dated 10/18/2011
- Behavioral Health Evaluation for Mr. Shaun J. Marvin, by Frank J. Godshall, PhD., Evans ACH, Outpatient Mental Health Department, Ft. Carson, CO, dated 11/02/2016
- Polysomnography Interpretation Report for Mr. Shaun J. Marvin, by Mikkael Lewis, MD., Colorado Springs Military Sleep Center, dated 10/30/2018

Brennan Institute for Mind-Body Healing
1801 Robert Fulton Drive, Suite 230, Reston, VA 20191
Ph: 703-391-9410 • Fx: 703-476-7634
www.brennaninstitute.org

- Medical Records for Mr. Shaun J. Marvin, Department of Veteran Affairs, Colorado Healthcare System, dated 7/11/2019 to 1/5/2021
- Certificate of Release or Discharge from Active Duty (DD Form 214) for Mr. Shaun J. Marvin, signed by Ms. Arlene M. Nicholson, dated 12/28/2018
- Printout of Docket File for U.S. v Marvin, from www.courtlistener.com, dated 05/22/2022
- Criminal Complaint, by Ms. Emily Eckert, Special Agent, FBI, U.S. District Court for the District of Columbia, dated 01/06/2021
- Child Victim and Child Witness Identity Information Report (Form FD-302), by Special Agent (SA) Amber K. Cronan, FBI, dated 01/07/2021
- Child Victim and Child Witness Identity Information Report (Form FD-302), by SA K.C. Hughes and SA Deborah Bristol, FBI, dated 01/19/2021
- Pretrial Services Report for U.S. District Court, Docket Number 21-000005-M-03, U.S. v. Marvin, by Ms. Christine Schuck, dated 03/10/2021
- Government's Memorandum in Support of Pretrial Detention, Case Number: 21-MJ-5, U.S. v. Marvin, U.S. District Court for the District of Columbia, undated
- Opposition to Government's Motion for Preventative Detention and Motion for Pretrial Release Pursuant to 18 U.S.C. § 314, Case Number: 21-MJ-5, U.S. v. Marvin, U.S. District Court for the District of Columbia, undated
- Plea Agreement, Criminal Case No. 21-cr-673, U.S. v. Marvin, by Mr. Matthew Graves, United States Attorney, District of Columbia, Department of Justice, dated 11/3/21
- Statement of Offense, Criminal No. 21-cr-673 (TJK), U.S. v. Marvin, U.S. District Court for the District of Columbia, dated 11/9/2021
- Presentence Investigation Report, Docket No.: 0090 1:21CR00673-001, U.S. vs. Marvin, U.S. District Court for the District of Columbia, dated 06/07/2022

**Reason for Referral**

Mr. Marvin was referred to this examiner for a psychosexual risk assessment by his attorney, Mr. Edward Ungvarsky, following his conviction on 1 count of the felony charge **18 U.S.C. § 2252A(a)(2) Distribution of Child Pornography** in the U.S. District Court for the District of Columbia. This examiner conducted the assessment in Washington D.C. at the D.C. Department of Corrections, Central Treatment Facility, where Mr. Marvin has been detained at this facility since 3/11/2021, having been transported there from Colorado Springs, CO, where he had been detained following arrest on 1/7/2021. This examiner informed Mr. Marvin of the nature of this assessment and limits to its confidentiality. Mr. Marvin then granted his full consent to participate.

**Government's Account of the Alleged Offense**

The Government's Account of the Alleged Offense is derived from Mr. Marvin's Pre-Sentencing Report (PSR) completed by Ms. Kelli Willett, U.S. Probation Officer, and submitted to the U.S. District Court for the District of Columbia by Mr. Brian D. Shaffer, Chief U.S. Probation Officer. The Government's account below closely reflects details provided in the Statement of Offense filed with the Court on 12/9/2021:

On 10/1/2020, an Undercover Federal Law Enforcement Officer (UC) entered a special interest user group on the online social media platform known as KIK, entitled "you.ngshare". According to the Government's Statement of Offense, this group forum was designed for members to exchange child pornography media files. The UC monitored group activity for a period of several days and discovered some users exchanged child pornography files, while some users participated in group chats discussing sexual fantasies about the abuse of children. On 10/13/2020, Mr. Marvin logged on to the "you.ngshare" user group with the username "marvinmash" and the display name "PBJ PBJ". The UC observed Mr. Marvin post a 1-minute video to the group that depicted 2 female children approximately 11 to 13 years old removing their clothes, spreading their legs apart and exposing their bare vaginas directly into the camera. On 10/15/2020, Mr. Marvin posted a 1 minute 56 second video file to the group which opened to the words "Sweet release…Girls getting showered in CUM" printed on the screen. It consisted of approximately 18 videos spliced together, all depicting faces of prepubescent female children as men ejaculated on their faces or in their mouths. Then on 10/17/2020, Mr. Marvin posted a 49-second video file depicting a nude female child approximately 9 to 11 years old on her hands and knees, then moving to position herself to exposes her anus and vagina to the camera while she masturbates.

According to PSR report, on 1/7/2021 law enforcement officers executed a search warrant at Mr. Marvin's residence and seized several digital devices and placed them into evidence: including: an iPhone 11, a MacBook laptop computer and a My Passport external hard drive. Officers placed Mr. Marvin under arrest and took him into custody in Colorado. During the criminal investigation and review of Mr. Marvin's devices, the MacBook laptop computer reportedly contained approximately 100 images of child pornography, and the external hard drive contained 25,000 images and 15,000 video files of suspected child pornography. The PSR noted some of these images featured infant and younger child subjects who were subjected to various forms of sexual exploitation, indecency, or acts of sexual assault. The PSR report also detailed the digital file folder system that existed with labels/titles alluding to certain sexual themes, such as BDSM, girls in princess gear and young porn.

During the criminal investigation and review of Mr. Marvin's iPhone 11, agents discovered additional chats on KIK that indicated he had shared Mega link folders with others that contained child pornography. After Mr. Marvin's arrest, FBI agents were assigned to interview his ex-wife Nicole and his biological daughter Alyssa. These interviews were conducted in collaboration with a professional child advocate at a designated facility. At interview agents questioned the mother and daughter about the nature of any potentially incriminating allegations of child sexual abuse against Mr. Marvin. Reportedly Mr. Marvin's 7-year-old daughter alleged he had solicited her to photograph herself naked at his residence at some unspecified time in the past and disclosed that Mr. Marvin had punished her when she refused. In its Opposition to Government's Motion for Preventative Detention, Mr. Marvin's Counsel raised substantive objections to his pretrial detention, which are not directly acknowledged or addressed in Ms. Willett's PSR report. The Court ruled to deny Mr. Marvin's Motion for Pre-trial Release. He has remained in detention from his arrest on 1/7/2021 until the present. He signed a plea agreement on 12/9/2021 and remains in detention pending sentencing date scheduled for 10/4/2022.

**Mr. Marvin's Account of the Alleged Offense**

At interview, Mr. Marvin provided his own narrative account of the alleged offense to this examiner. He reported he began conducting searches for different online user groups featuring child pornography content which led him to the "you.ngshare" interest group on KIK. Mr. Marvin stated the group administrator responded to his request to join by directing him to submit child pornography files to the site to verify his interest. He identified his submission for this request as the same child pornography file detected by the undercover agent in his criminal investigation. Mr. Marvin noted he later submitted 2 other child pornography media files to prompt other users to respond in kind and upload more of their personal child pornography material. He denied any personal interest or gratification in sharing the submissions and denied any intent to distribute child pornography material. Mr. Marvin said the files he posted were simply recycled material from the "you.ngshare" group and denied ever producing child pornography content or seeking to create a shared network of his own. He told this examiner he was conscious to reduce his level of engagement with other more avid, "hard core" users in the group and denied participating in online chat about sexual fantasies of children or child sexual abuse, which these hard-core users frequently promoted. Mr. Marvin said he rationalized his own viewing of child pornography as victimless, while feeling appalled by the more depraved fantasies indulged in chat by these hard-core users. He recalled some group members would prompt him to post specific graphic content featuring themes of child sexual assault or exploitation, which he said he consistently declined to do, and often resulted in his leaving the group altogether. Over time, Mr. Marvin said he became aware of his compulsive pattern of pornography use, which included illicit child pornography. He said he distributed these links at points where no one had submitted new material for some time. As with other forms of pornography, Mr. Marvin noted he would become desensitized to his existing store of pornographic material to the point that he would seek out novel content through these promptings. He said he felt no excitement about talking about child exploitive fantasies and did not seek to affiliate with others on this basis. Mr. Marvin noted that his urge to acquire and collect such material became a motivation itself, beyond any sexual stimulation the images provided. His preoccupation with downloading pornography in general became increasingly focused on sorting out the content into folders and subfolders according to specific content themes and spent more of his time collecting and sorting pornography media files rather than viewing and masturbating to them. Such pornographic content was typically available for download in the form of large archive files, which he stored on various storage devices but eventually moved to cloud servers he could access anywhere, to include times when he was camping outdoors alone or on work travel.

Mr. Marvin noted that in the months prior to his investigation, his pattern of child pornography use became more erratic, "binging" on such material for a few days at a time, then abstaining or switching to adult pornography for a period of time before lapsing again. Mr. Marvin contrasted his more pervasive and chronic pattern of adult pornography use with his episodic "binge" use of child pornography. He said he minimized the risk he incurred and noted he made frequent attempts to quit by vowing to not look at child pornography any longer and deleting all the illicit content on his storage devices. However, Mr. Marvin said he would then go back to downloading more child pornography content from the cloud again. Mr. Marvin denied ever looking at child pornography during the time he was married and raising children with his wife. He did report that as his marriage reached a period of

acute conflict, he began looking at adult pornography more frequently. When his ex-wife discovered his use, she raised quite a "hullabaloo," and often pointed out his use as a source of blame for their failed relationship. Mr. Marvin's ex-wife responded to strongly because she had Mr. Marvin pledge to never use pornography when they married because her former partner also consumed a lot of pornography, which was a problem for her. With Mr. Marvin's increased use, she began to suspect he was having an affair, and at one point she had his phone monitored by a professional technician without his knowledge. Mr. Marvin said his pornography use became more intense, for about the year following his divorce, and said he engaged in more casual sexual relationships at this time as well.

## Significant Background History

*Family History*

Mr. Marvin was born in Ft. Thomas, Kentucky as the eldest of three children to married parents Brent and Georgia Marvin, ages 67 and 68, and raised with his 2 siblings in the Brighton, MI area, where his parents still reside. He has 2 younger brothers, Ryan, age 39, who is married with 4 kids and lives in Brighton and works as a bartender. Mr. Marvin's youngest brother Kyle, age 28, currently lives in Corinth, TX, where he works as a mortgage broker, and is married but with no children. Mr. Marvin described his relationship with his brother Ryan as typically conflicted and distant and said they have not spoken since his arrest. Mr. Marvin spoke of having a more harmonious relationship with his brother Kyle, but the two have also not spoken for the last few years.

Mr. Marvin described the family atmosphere as ostensibly stable, as they followed the typical routines of a suburban middle-class family, but said he experienced the family's dynamics as more dysfunctional and unsettling reality. He described feeling quite unsettled about the frequent arguing he witnessed between his father and younger brother Kyle and reported feeling lonely and neglected by his parents.

Mr. Marvin depicted his father as a functional alcoholic who reliably went to his stable job each day but often consumed a few alcoholic drinks while watching television upon his return home most weekday evenings. He noted, however, that his father typically supported him in extracurricular sports, such as little league, during his school-age years. Mr. Marvin said his father and brother Kyle engaged in pitched arguments most nights at the family dinner table, which left him feeling unsettled and invisible within his family. He said he typically felt misunderstood by his parents, which he resented. According to Mr. Marvin, he himself frequently argued with his parents over limit setting. This pattern of conflict culminated in a major dispute over his insistence on attending a local rock concert on a school night. He said he defied his parents' objections by attending to the event and returned home later to find himself locked out of the house with all his possessions left on the front porch. Mr. Marvin said he responded by moving on and stayed with various friends and neighbors while he completed his senior year of high school. He reported having enlisted in the U.S. Army after graduation to become independent.

In her collateral interview, Mr. Marvin's mother shared her own account of these events in her son's life, which diverged from with her son's narrative regarding the nature of their parent-child interactions and the specific course of these events. She denied ever witnessing Mr. Marvin's father drink excessive amounts of alcohol or show other signs of a drinking problem. Mr. Marvin's mother also depicted his father as a supportive presence in his life, having coached and supported him in organized sports and love of playing bass guitar. Mrs. Marvin said she remained at home as her son's primary caregiver until he started high school, at which time she took a part-time job working at a local bank for two afternoons each week.  She noted having consistently returned home from work each night before dinner. Furthermore, Mr. Marvin's mother denied having witnessed frequent arguments between his father and brother Kyle at the dinner table.

Mr. Marvin's mother speculated her son may have unwittingly exaggerated the extent of his brother Kyle's irritability. She offered her own perspective that Kyle's relationship with his father seemed quite normal considering he was a 14-year-old boy ready to disagree with his father as an authority figure. However, Mr. Marvin's remarked that her son was likely honest about feeling alienated and misunderstood by his family. She stated she could understand his alienation in light of her own bewilderment in trying to "understand his mind" and motivations, which often left her feeling confounded about how to effectively respond to him.

Mr. Marvin's mother characterized Mr. Marvin's childhood disposition as emotionally sensitive and reactive. Moreover, she disputed the course of events that spurred him to leave home. Mr. Marvin's mother denied having ejected him from the house at age 17. Mr. Marvin's mother granted the possibility she may have advised him to stay elsewhere for a night or two but noted Mr. Marvin had decided on his own to leave home during his senior year of high school. In fact, she recalled having sighted him in the neighborhood on a few occasions and sometimes heard from neighbors whenever he moved to live with another family that year. He followed this transient pattern until he finally returned home for the brief period from high school graduation until he began his enlistment in the U.S. Army months later.

Mr. Marvin's mother said her son's decision to join the U.S. Army seemed sudden and unexpected to her given that one day he simply came home and announced he had already enlisted. She recalled that she rarely heard from him during his first few years of duty. According to Ms. Marvin, he disclosed few details about his personal life during the rare phone conversations during this time.

Mr. Marvin's mother told this examiner that she and his fiancée Ms. Lang, are currently the only significant others in her son's life who have continued to speak to him since his incarceration. She has maintained regular contact with Mr. Marvin and feels intent on supporting him unconditionally, regardless of his criminal conviction or their past relational difficulties. She noted how they have both tried to strengthen their connection through written and phone communication. Mr. Marvin's mother stated she has received several letters from Mr. Marvin in which he has expressed his remorse for his offense and the negative impact on his family. Furthermore, Mr. Marvin's mother reported her son has told her he misses his father and refers to him as his "hero." Mr. Marvin confirmed at interview that his

father and siblings have cut-off communication with him since his arrest, citing their objection to the nature of his offense.

Mr. Marvin reported experiencing a few major adverse experiences in his youth. First, he disclosed having been sexually abused at age 8 or 9 by a 13- or 14-year-old male peer in his neighborhood. Mr. Marvin stated that he did not wish to speak about it to the PSR intake officer. He disclosed it for the first time to his attorney several months ago. Mr. Marvin discussed the incident in further detail with this examiner. Mr. Marvin discussed the incident in greater detail with this examiner. He said he used to collect "Garbage Pail Kids" stickers as a child. He was approached one day by the older youth who had proposed giving him some of his own stickers if he came over to his house that afternoon. Mr. Marvin complied but said he noticed the older boy became increasingly overbearing and demanding in his tone once he entered the house. He followed the older boy's direction to enter his room. Mr. Marvin stated the older boy told him to pull down his pants down and expose his penis to fulfill their agreement. He also made vague threats to hurt him if he did not comply. Mr. Marvin said he felt trapped and anxious at the time. He felt very "put on the spot" by the young man's insistent tone. He said he exposed himself as requested and the older boy gave him the sticker cards. Mr. Marvin stated he could not recall if the older boy had touched his genitals or had him perform any sexual acts. However, Mr. Marvin noted feeling confused and ashamed in the aftermath. He felt quite wary of the fact that the boy lived in his neighborhood and sought to avoid attracting further attention from him. Mr. Marvin noted he felt it was unacceptable to disclose the abuse to anyone and generally found it harder to trust people. He avoided the street where the boy lived. Mr. Marvin recalled he tried to suppress the memory of his sexual abuse but continued to "feel bad" about himself.

At interview, Mr. Marvin's mother confirmed that her son never disclosed this abuse incident to her. Additionally, she said she believed him and felt truly saddened to discover he had carried this experience as a shameful secret that likely burdened him all these years.

Mr. Marvin reported experiencing another major adverse event at age 26. He was stationed at Fort Gordon, Georgia to complete his U.S. Army Advanced Individual Training (AIT) course. While off duty, he ventured by himself to downtown Augusta to view the town's featured statue of the music artist James Brown. Mr. Marvin remembered walking down the street smoking a cigarette to suddenly realize it had fallen to the ground. He had not yet recognized that he had been struck in the head by a young man who had assaulted him from behind. A second young man in front of him then proceeded to deliver another blow. Mr. Marvin stated he then felt surrounded by an entire group of young black men who continued to assault him and struck him repeatedly while he thought "what did I do to provoke this?" Mr. Marvin said he then sustained a blow to the lower base of his skull and lost consciousness for a few moments while still being hit. Mr. Marvin recalled trying to regain consciousness and regain his footing to escape but could not. Eventually the assault was broken up by the police, who arrested his assailants based on witness identification. Mr. Marvin reported he was rushed by ambulance to the hospital. The EMT technician was a prior service member who informed Mr. Marvin's unit commander of the incident. U.S. Army medical records indicate Mr. Marvin sustained wounds to his face and lip which required sutures. He reported having experienced post-concussive symptoms for a time after his assault, to include difficulty concentrating and episodes of

mild mental confusion. Mr. Marvin's Army medical records also indicate that he presented to the outpatient medical clinic at Ft. Gordon on 5/9/2005 and 5/11/2005 for follow up care for his persistent pain in the occipital region of his skull, for which he was prescribed Naproxen, a non-steroidal anti-inflammatory medication (NSAID) and Percocet, a narcotic prescribed for pain relief. Mr. Marvin denied ever having been formerly evaluated by a medical professional for presence of traumatic brain injury.

In addition, Mr. Marvin said he felt particularly distressed by his supervisor's blatant suspicion that he had provoked a racially motivated confrontation with his assailants. Only after lengthy interrogation was he able to quell their suspicions. Mr. Marvin noted his supervisor expressed no concern for his welfare and simply returned him to his training unit at Fort Gordon.

*Social History*

According to Mr. Marvin, he enjoyed having a few acquaintances in his youth but maintained few if any longstanding friendships. Mr. Marvin also noted he has maintained few if any close friendships as an adult. His mother noted his chronic pattern of social and emotional adjustment problems throughout his school years. At interview, Mr. Marvin stated that he been rather self-isolated and kept mainly to himself during his career in the Army. He formed positive relationships with many of his bandmates while serving in the U.S. Army Field Band but kept up no lasting connections there either. After his retirement from Army active duty, Mr. Marvin started a support group for divorced single parents through Facebook and organized in-person social gatherings which allowed him to form positive connections with other divorced parents. Mr. Marvin reported he has remained isolative while at the D.C. jail and typically avoids people because he is wary of trouble. At times, he has felt the correctional staff have ignored his basic requests for fresh clothing or bed linens during the height of the of the COVID pandemic, and said he once lost his composure and vented his frustration toward staff members. Mr. Marvin said he was surprised to discover they finally responded to him as a result after having witnessed other inmates take similar action to evoke a response. On a positive note, he reported having enjoyed playing chess and taking classes with some of the more thoughtful inmates at the detention facility.

*Relationship History*

Mr. Marvin's first major relationship was with his ex-wife, Ms. Diana Nicole Marvin. They married when he was 32 years of age and divorced 7 years later in 2018. During their marriage they conceived 3 children together, son Aaron, age 11, daughter Alyssa, age 9, and youngest daughter Josey, age 7. Mr. Marvin said he has not had contact with his children since court proceedings in 2018 when he initially lost custody. Mr. Marvin expressed his regret over his lost connection with his children hopes to eventually restore his presence in their lives. Moreover, Mr. Marvin said he fears that his criminal conviction may ultimately prevent him from ever having that opportunity.

Mr. Marvin characterized the relationship with his ex-wife as rather stormy. By his account, they argued frequently about her wanton spending of the family income on personal merchandise. He said

she eventually sold off his musical equipment out of spite after an argument. Mr. Marvin recalled he felt upset with her for taking his property without permission. When upset, he would counterattack defensively. In a few instances, he recalled she tried to record his responses out of context to portray him as an abusive partner. At one point she filed a complaint of domestic violence with his Army chain of command, which led to a family services investigation on post. According to Mr. Marvin, the report did not substantiate any evidence of violence or abuse but led the committee to refer him for domestic violence classes to better control his temper. Mr. Marvin's mother recalled a similar version of events regarding his marriage to Diana. His mother recalled having initially formed a positive impression of her when she visited them in Hawaii where he was stationed at the time. Mr. Marvin said he and his wife, and his parents had vacationed together a few times on camping trips. His mother noted the evidence of his ex-wife's extravagant spending habits in the form of newly purchased items strewn throughout the house, and said she was concerned about Diana's unwillingness to take on a job. However, she said what struck her most was Mr. Marvin's unwillingness to consider or discuss leaving his wife or setting non-negotiable limits or boundaries in his marriage to protect his family against the prospect of financial ruin or damaging false allegations by Diana. Mr. Marvin's mother said Diana continued to have direct access to Mr. Marvin's paychecks, while he seemed resigned to fight with her over the same issue to no avail, while feeling increasingly helpless and frustrated. Mr. Marvin's mother anticipated the course of her son's marriage would inevitably lead to a poor outcome, as it did.

Mr. Marvin's more recent notable relationship is with his fiancée, Ms. Kristi Lang, whom he initially met in 2018 through his social group for divorced single parents. Mr. Marvin's positive depiction of their relationship is cited in the Government's PSR report. This examiner interviewed Ms. Lang by telephone to gather collateral information. At interview, she noted her initial impression of Mr. Marvin as very polite and considerate in giving time and effort to making her and the other members feel welcome. She said she was impressed by what a well-mannered and courteous man he was, which she attributed to his experience in the military. In retrospect, Ms. Lang said she could see how his social demeanor was somewhat awkward and immature, but she. found him to be deferential and accommodating with her, and given her own unpleasant ordeal with her ex-husband, she felt particularly appreciative of Mr. Marvin and grateful for their stable and supportive relationship. Both Mr. Marvin and Ms. Lang reported they had moved in together by 2019. Overall, Ms. Lang described Mr. Marvin as a stable partner toward whom she loves and inherently trusts. She reported they have also enjoyed a healthy and intimate sex life. Ms. Lang also noted she shares custody of her son Alex, age 17, with her ex-husband. She reported Alex has often stayed with her and Mr. Marvin during his visitation times with her. By Ms. Lang's account, Mr. Marvin has formed a positive, supportive and appropriate relationship with her son over time. She observed Mr. Marvin has offered support and encouragement to Alex to help him succeed in his endeavors. Ms. Lang said she plans to continue supporting Mr. Marvin during his sentencing and incarceration. She stated Mr. Marvin purchased their residence in Colorado Springs, CO from his ex-wife in 2018. Ms. Lang said she plans to continue taking care of the home while she resides there and will maintain his financial affairs now that she retains power of attorney.

Ms. Lang shared some observations regarding Mr. Marvin's relational style. She denied having any specific concerns about his sexual behavior or for her son's safety. Ms. Lang noted she met Mr. Marvin

during his custody battle and shared several reasons for her skepticism about his ex-wife Diana's allegations that he sexual abused his daughter Alyssa. Ms. Lang said she was present during much of his ex-wife's previous Court petition for full custody of their children. She reported Mr. Marvin's ex-wife had petitioned the local juvenile and domestic relations court in Colorado Springs for full custody of their children. By Ms. Lang's account, the Court had appointed a forensic psychologist to conduct a child custody evaluation for his children. She said the Court-appointed psychologist had approached her and Mr. Marvin to inform them he had received several "volumes" of rambling and vague complaints from his ex-wife regarding his parenting of their children, none of which constituted any real transgression. The psychologist warned them that Mr. Marvin's ex-wife had also expressed unfounded suspicions "of what he might do" to the children in the future. Ms. Lang said the psychologist strongly advised that she and Mr. Marvin consider installing cameras in their home to protect him against false allegations from his ex-wife in the future. Ms. Lang noted Mr. Marvin's ex-wife had continued to submit these anecdotes to the psychologist, which the psychologist continued to review despite his skepticism, while continuing to bill Mr. Marvin for his time.

Both Ms. Lang and Mr. Marvin's mother reported an incident wherein Mr. Marvin's ex-wife accused him of poisoning their daughter Alyssa with arsenic. Ms. Lang said that despite the allegation, the ex-wife never took her daughter to receive urgent medical treatment. Reportedly Mr. Marvin's ex-wife claimed to have sent away for her own toxicity test, which allegedly came back positive. Eventually the daughter was screened as directed by the Court and she tested negative.  The Court admonished Mr. Marvin's ex-wife for her behavior. Ms. Lang said the ex-wife's behavior seemed wildly preposterous to her, so she therefore gave little credence to her allegations of abuse which arose from the FBI interview of her and Alyssa. By both Ms. Lang's and Mr. Marvin's mother's account, Mr. Marvin's inability to take action to defend himself against these baseless accusations was surprising. They both reported he instead became increasingly distressed and preoccupied, while allowing Diane to jeopardize his credibility, as well as his custodial rights to his children.

*Sexual History*

Mr. Marvin identified his sexual orientation as heterosexual, and said he is primarily attracted to adult females and pubescent females. At interview, Mr. Marvin acknowledged he was sexually aroused by the child pornography content he had been viewing in recent years with subjects ranging from age 8 or 9 up to mature adolescent females. He said he was first exposed to pornography at age 8 or 9, mostly in the form of Playboy or Penthouse magazines owned by his peers' parents which he discovered in his friends' homes.

Mr. Marvin reported he began masturbating after onset of puberty around age 13 or 14 and said he typically did so once every few days. He said he mostly masturbated to fantasies about girls from school or the neighborhood to whom he was attracted. Mr. Marvin said his level of masturbation reached its height during adolescence, masturbating as often as twice a day. He reported first having vaginal intercourse with a partner at age 16, a consenting act with a female peer, and said he had few if any romantic relationships while in high school.

Overall, Mr. Marvin estimated a total of about 20 to 30 sexual partners—all of them consenting adult women. He noted most of these experiences were in the context of dating relationships. Please refer to Mr. Marvin's Account of the Instant offense for more details regarding his history of pornography use. In retrospect, he acknowledged becoming more compulsive with his use of pornography as a primary way to cope with stress and withdraw more from difficult realities in his everyday life. He said he began using child pornography with greater frequency, which eventually led him to join a few different child pornography-related special interest groups on KIK and other social media platforms after his marriage ended badly. Mr. Marvin said he would store files on Mega and other cloud server networks so he could access them remotely from his phone. He specifically recalled times when he would go camping in the woods on his own for a few days in advance of his family to decompress and access the illicit images during his retreat.

However, Mr. Marvin noted his ambivalent desire to stop such activity. He thought he could stop from his own will to do so and would typically quit for a few days to only relapse shortly after. Mr. Marvin told this examiner that he had never before fully appreciated the harmful impact of child pornography on the victims until now. He expressed regret for the negative impact of his conviction on Ms. Lang and his relationship with his own children. Both Mr. Marvin and his fiancée Ms. Lang noted his struggle to understand the profound moral ramifications of such behavior and why it is been deemed so gravely concerning and objectionable by the criminal justice system. At interview, Mr. Marvin admitted he had rarely considered the potential impact of child pornography on these young subjects featured in these digital photos and video clips. He described feeling detached from the victimizing nature of it and collected these files as if they were merely slides. Mr. Marvin also noted his repulsion at the other group users' graphic chats about child sexual abuse that often accompanied their posts. He said he avoided these chats and only shared links to child pornography content he had recycled from "you.ngshare" and other sites as a way to prompt others to share more of their content for him to download.

*Educational/Vocational History*

Mr. Marvin's attended Hartland High School in Hartland, MI. He said he struggled with mediocre grades but graduated on time with his peers in 1997. He said that during school he participated in extracurricular activities such as track and baseball as team sports, as well as the marching band. Not long after graduation, Mr. Marvin enlisted in the U.S. Army in 1998. He completed basic training at Ft. Leonard Wood in Missouri and received training as a Cable Specialist in communications at Ft. Gordon in Georgia. Mr. Marvin said he later switched his military occupation specialty to that of a Bandsman and joined the U.S. Army Field Band at Little Creek Field Base in Norfolk, Virginia. According to form DD214, Mr. Marvin retired with an honorable discharge in 2018 after 20 years of service and having achieved the rank of Staff Sargent (E6). During his tenure as a Cable Specialist, Mr. Marvin was deployed to Afghanistan twice, for 10 months in 2002-03 and for 3 months in 2003-04, and later to Iraq for 6 months in 2011. Other duty stations included Hawaii and South Korea. During his time in the Army band, Mr. Marvin was primarily stationed in Colorado. The PSR report details Mr. Marvin's military awards and training history. After his retirement in 2018, Mr. Marvin secured employment as a network security analyst at a small cybersecurity company called Route 98 in Colorado Springs, CO,

where he worked from March 2019 until his arrest in 2021. Mr. Marvin lost his job because of his incarceration. Prior to his enlisting in the Army, Mr. Marvin reported a stable history of employment in various food service jobs.

*Medical/Developmental/Psychiatric History*

Mr. Marvin's mother reported she had a normal pregnancy and delivery. She said he was a very impulsive and hyperactive child who frequently took off from the house unannounced. During his school age years Mr. Marvin was eventually diagnosed with ADHD by his pediatrician, for which he took Ritalin by prescription to mediate symptoms. However, Mr. Marvin's mother remarked she felt his emotional difficulties never seemed fully accounted for by the simple ADHD diagnosis.

Mr. Marvin's medical records and PSR report document his medical history of orthopedic conditions and minor surgeries that occurred mostly during his adult years. He was evaluated and qualified for medical and mental health disability by the U.S. Department of Defense upon retirement and was granted 100% disability payment based primarily on his diagnosed conditions of post-traumatic stress disorder and sleep apnea. Mr. Marvin received counseling and venlafaxine medication while still enlisted in the U.S. Army and continued to receive care through the Eastern Colorado Veteran's Administration System until the time of his incarceration. In 2016 Mr. Marvin presented to the Medical Clinic at Ft. Carson complaining of suicidal ideation, having contemplated suicide by gun shot. He reported experiencing depressed mood and was admitted to a psychiatric inpatient unit at Aspen Pointe hospital. According to Mr. Marvin, his psychiatric hospitalization occurred in the midst of his legal and emotional crisis of divorce from his ex-wife. Records indicate he presented to the emergency department after she had made allegations of domestic violence and abuse, which he feared would ruin his career and employment. He complained of feeling the weight of the world on his shoulders and wanted relief. According to the Government's PSR report, DC Jail records confirm Mr. Marvin's diagnosis of Major Depressive Disorder, for which he currently takes venlafaxine 150mg ER daily. The report notes Mr. Marvin's mental health intake at DC Jail on 3/8/2021 and follow up appointments on 5/13/2021, 7/27/2021 and 10/15/2021.

*Substance Use History*

Mr. Marvin's substance use history is remarkable for excessive alcohol use primarily during his young adult years. He noted first having tried beer at age 17. During his adolescence and early period of enlistment in the Army he often consumed 3 to 4 beers a day after work or on weekends with friends, typically to the point of mild intoxication. Mr. Marvin noted early in his military career he was caught drinking underage and was required to participate in a substance abuse treatment program. His alcohol reduced in more recent years and Mr. Marvin reported he last consumed alcohol at age 42 prior to his incarceration. Mr. Marvin reported having used marijuana occasionally for recreational use as a teenager and in his adult years after retiring from the military. He said he last used the substance at age 43 and denied any problems in his life related to his use of marijuana. Mr. Marvin reported having tried LSD a hallucinogen while in high school but said he has not used the substance since. He denied any other significant history of illicit or prescription drug abuse.

*Legal History*

Mr. Marvin's legal history is marked by 2 arrests. On 8/23/2017 Mr. Marvin was arrested on contempt of court in Colorado Springs, CO for allegedly violating a protective order against him by his ex-wife. The contempt charge was dismissed by the local district attorney on 8/25/2017. On 7/23/2018, Mr. Marvin was arrested a second time for contempt of court in Colorado Springs, CO for allegedly failing to appear in Family Juvenile Domestic Court for a hearing. At interview, Mr. Marvin noted he never received the Court's subpoena which had been mailed to an incorrect address. On 1/7/2019, the Court granted Mr. Marvin a deferred disposition for the matter and 12 months unsupervised probation, which he has since successfully completed, and on 1/19/2020 the charge was dismissed. Mr. Marvin denied any other record of criminal arrest or convictions prior to his current offense.

**Behavioral Observation and Mental Status**

Mr. Marvin is a 43-year-old divorced White male who presented as disheveled in appearance, with hair and beard unkempt. He was average in height with a stocky build and appeared to be his stated age. Mr. Marvin displayed an anxious affect and described his mood as unhappy but "trying to stay motivated." He showed evidence of mild psychomotor retardation as evidenced by his deliberate gait and physical movements during the interview. Mr. Marvin's overall disposition was cooperative toward this examiner. His rate, rhythm and volume of speech were all within normal limits. Mr. Marvin's negative mood was congruent with his expressed negative thoughts regarding feelings of rejection and loss. He seemed oriented to person, place, time, and the testing situation. Mr. Marvin seemed frequently distractible, showing concentration difficulties when trying to stay on task during testing and interviews. His thought process seemed typically logical and coherent but could become tangential and more fragmented when discussing more distressing events from his past. There was no evidence of a thought disorder. Mr. Marvin's memory appeared intact, as evidenced by his sound recall of both recent and more remote life events, and his cognitive judgment seemed fair based on his description of his adaption to his current detention setting thus far. Furthermore, he displayed poor insight regarding the nature of his presenting problems. At interview, Mr. Marvin denied experiencing psychiatric symptoms to include bizarre mental experiences, visual or auditory hallucinations, suicidal or homicidal ideations.

**Clinical Formulation**

Mr. Marvin is a 43-year-old divorced White man who presented for this psychosexual assessment pending sentencing in U.S. District Court in District of Columbia for his criminal conviction of 1 count of Distribution of Child Pornography. This examiner conducted 2 clinical interviews with Mr. Marvin at the D.C. Correctional Center, Central Treatment Facility, and conducted collateral phone interviews with his mother, Ms. Georgia Marvin, and his fiancée Ms. Kristi Lang. This examiner also reviewed the Government's file of evidence made available through motion for discovery, as well as the Statement of Offense, and the draft of the PSR report.

This examiner also administered Mr. Marvin standard personality measures the MMPI-2, the MCMI-IV, and the TSI-2 to assess his current level of psychological functioning.

This examiner applied a motivation-facilitation framework for organizing his clinical formulation to explain how Mr. Marvin's psychological profile, environmental and situational factors, all intersected in a manner that may have led him to commit the index offense.

Assessment findings indicate Mr. Marvin has predispositions in his personality that left him more prone to commit his child pornography offense. He reported having experienced sexual abuse by an older male peer at age 8 or 9. Based on his self-report, he had already been exposed to adult pornography in the form of print magazines by this time. Both his experience of sexual abuse by the older boy and his early exposure to pornography probably contributed to his early eroticization during childhood. In other words, Mr. Marvin would have been sexually overstimulated by sexual abuse, particularly at a young age. Furthermore, the perpetrator's use of coercion would provoke Mr. Marvin's feelings of helplessness and objectification. Mr. Marvin's sense of alienation in childhood made him particularly vulnerable to the older male's proposed attention and favors, but left him feeling ashamed and confused in the aftermath.

In many of Mr. Marvin's turbulent relationships with family members and romantic partners, he has been hypervigilant to perceived threats of a similar nature. Mr. Marvin's feelings that he must suppress these memories and avoid disclosure would have contributed to his existing sense of distrust and alienation from others and heighten his already anxious childhood temperament reported by his mother. Furthermore, Mr. Marvin's core problems with emotional regulation, possibly linked to his childhood ADHD, would have likely been further exacerbated by the traumatic stress of childhood sexual abuse. Moreover, childhood sexual abuse is known to disrupt a child's normal sexual development. Mr. Marvin's experience of childhood sexual abuse quite possibly led to some degree of fixation in this stage of development, and the abuse could have likely contributed to some level of pedophilic sexual interest. As a result, Mr. Marvin's would regress from his typically normal adult sexual interest to more pedophilic themes when under stress—particularly when emotional themes of helplessness, rejection and mistreatment are evoked by interpersonal conflict. Some theoretical models of childhood sexual abuse posit that child victims of sexual abuse may possibly revisit such themes through the fantasies evoked by child pornography from a psychologically safe distance.

Mr. Marvin first engaged in masturbating to adult pornography before eventually seeking out child pornography content as his pattern of use became more compulsive over time. Many offenders become increasingly desensitized to mainstream pornography over time and thus more disinhibited and prone to indulge pedophilic fantasies through use of child pornography. In more recent years, Mr. Marvin's level of online child pornography activity became increasingly prominent. He reported having immersed himself in viewing child pornography for at least a few days at a time and then abstaining for weeks or months before eventually returning to seek out child pornography once again. This maladaptive behavior seems to have become a primary emotional coping response for Mr. Marvin and contributed to his existing sexual preoccupation with pornography. Findings indicate Mr. Marvin was deferential in confronting his overt interpersonal problems, specifically with his ex-wife and his family.

Findings suggest he failed to develop more healthy, effective capacities to regulate his emotions, thus making him more prone to sexually compulsive behavior.

Findings show Mr. Marvin's poor relational skills and stormy relationships have also served as barriers to establishing greater intimacy in his life. Personality findings suggest he is conflicted between a dependency on others and a desire to seek out nurturance from others and can become quite frustrated and disillusioned when ultimately, he fails to satisfy his own needs. Mr. Marvin has few skills for verbalizing and negotiating such relationships and lacks the social judgment to properly identify relationships that would seem codependent, problematic and least likely to succeed from the start. He instead will carry on, feel increasingly fatalistic and helpless, and ultimately react impetuously to significant others, such as his ex-wife, when they perceivably disregard his needs. This pattern of suppressing his negative feelings until he eventually reacts is often seen as unpredictable or erratic to others at first. For example, Mr. Marvin likely harbored unrealistic idyllic notions of success or happiness in his marriage, at first ignoring his ex-wife's financial irresponsibility, recklessness and temperamentality and untruthfulness. Instead, he persisted in the marriage and became increasingly fixated and intent on verbalizing his distress to his ex-wife and imploring her to stop. But his objections only provoked further conflict and led to threats to his reputation and family relationships, from which he failed to proactively take steps to protect himself.

Findings show Mr. Marvin's defensive insecurity limits self-awareness of his own role in contributing to a pattern of stormy relationships in his life. His response profile on test measures suggest he feels easily overwhelmed, fragile, and sensitive to perceived threats in emotionally tense situations. Mr. Marvin's rash emotional responses may be characteristic of his previously diagnosed post-traumatic stress disorder, stemming from childhood abuse and later reinforced by more adverse experiences later in his life, such as his gang assault while he was in the Army and the ubiquitous sense of threat during his military deployments and his tumultuous child custody battle with his ex-wife.

Mr. Marvin's frequent bouts of depression and anxiety may likely stem from his core sense of psychological fragility. This diagnostic impression is evidenced by test findings and medical records documenting his clinical diagnoses of PTSD, sleep disturbance, and major depressive episodes within his medical evaluation by the Veteran's Administration (VA) and his previous psychiatric hospitalization in 2011. Mr. Marvin's chronic deficits in emotional self-regulation serves as a major contributing factor strongly linked to compulsive pornography use and online sexual offending in the scientific literature. By Mr. Marvin's self-report, he would readily withdraw into pornography to include child pornography to alleviate his distress. By history, Mr. Marvin showed a greater level of investment in child pornography use over time. He established a cloud server account to store larger digital archive files in compressed format. Mr. Marvin had downloaded these larger files from links to other users' file collections hosted on cloud servers.

Notably, Mr. Marvin reported he gradually began to spend more time sorting and labeling these file folders rather than view this child pornography content directly. However, Mr. Marvin's reported *obsessive-collector* pattern of child pornography use is characteristic of many individuals convicted of child pornography offenses. According to the scientific literature, the true extent of such offenders'

deviant or paraphilic sexual interest is typically overrepresented or unduly magnified by the sheer quantity or range of the collected images discovered by the Government on his electronic devices. For Mr. Marvin's "obsessive collector" pattern of child pornography activity reflects a more generally compulsive pattern of sorting and organizing collected pornography files to preoccupy himself. Also notable is the fact that child pornography is now typically downloaded in the form of large, compressed archive files. Most child pornography offenders who have engaged in such illicit online behavior for any notable length of time will almost invariably be found by the Government to have large quantity of child pornography files stored on their digital devices. Therefore, multiple studies in the scientific literature have found no statistical link between the quantity of an offender's child pornography collection and risk of sexual recidivism.

## Risk Assessment

Mr. Marvin is criminally charged with distribution of child pornography, which is considered a non-contact sex offense. The Child Pornography Offender Risk Tool, Version 2 (CPORT) is an actuarial risk instrument developed to evaluate recidivism risk specifically for online, non-contact child pornography offenders.

According to the scientific literature, Mr. Marvin's child pornography offense places him in a markedly low risk category compared to individuals convicted of contact sexual offenses. His raw score of '2' on the CPORT is within the average range compared to other child pornography offenders within this characteristically low risk category. Specifically, Mr. Marvin has a **10% estimated rate of overall sexual recidivism and a 7% rate of recidivism for a specific child pornography offense among similar offenders in the research sample at 5 years post-release.**

In addition, this examiner used the STABLE-2007 as a structured professional judgement (SPJ) tool to identify potential dynamic risk factors for sexual recidivism that pertain to environment and current function that fall outside the scope of the CPORT. Dynamic risk factors are subject to change over time and are thus more amenable to treatment. The STABLE-2007 is useful as a SPJ tool because there is broad professional consensus that it contains risk factors which are generally considered relevant for risk assessment and treatment. There is also more recent research evidence to support relevance of the STABLE-2007 for online offenders.

The following dynamic risk factors from the STABLE-2007 should be considered critical targets for sex offender treatment and risk management in Mr. Marvin's case:

*Poor Problem-Solving Skills.* Findings show Mr. Marvin lacks social problem-solving skills to manage conflict and achieve better outcomes. He struggles to be proactive in identifying and solving problems before they lead to lasting fallout. As a result, he may frequently put himself into repetitive problem patterns and repeatedly expose himself to the same relationship stressors.

*Poor Emotional Regulation/Sex as Coping.* Mr. Marvin developed a primary reliance on masturbation to pornography to relieve emotional tension and withdraw from feelings of

hopelessness or helplessness in his life. This coping behavior extended to use of riskier viewing of, and later distribution of, child pornography, which suggests his efforts to alleviate distress can become riskier when his problems remain unabated, or he lacks support.

*Deviant Sexual Interest.* By Mr. Marvin's self-report, findings from the Correlates of Sexual Interest in Children Instrument, he displayed a significant pattern of sexual interest in pubescent and prepubescent children in addition to a more biologically normal sexual interest in mature adolescent and adult females. Findings from the scientific literature show that systematic sex offender treatment can be effective when it addresses any deviant sexual preferences when they are present. The goal of treatment would be to support or motivate Mr. Marvin to abstain from gratifying these more deviant sexual themes through illicit pornography and instead encourage him to achieve gratification more readily in the context of a healthy adult relationship, such as with his fiancée.

Mr. Marvin's risk profile also contains a few factors that may mitigate risk of recidivism. For one, he has displayed a generally prosocial lifestyle, he expresses a desire and interest in forming positive caring relationships with women his age, and he has maintained a stable history of residence and employment. There is no evidence of an antisocial or psychopathic personality traits. Mr. Marvin has expressed remorse and accountability for his offense, and displayed motivation to comply with treatment and supervision, and ultimately achieve successful rehabilitation.

## Recommendations

*The Court may wish to consider alternatives to longer term incarceration at sentencing.* Mr. Marvin would receive a sentence to incarceration for a term exceeding 4 to 5 years based on the current U.S. Sentencing Guidelines. Scientific studies have consistently shown no link between longer terms of incarceration for child pornography offenders and lowering of recidivism risk. These offenders maintain similarly low rates of recidivism. First-time child pornography offenders with Mr. Marvin's risk profile are typically amenable to outpatient sex offender treatment and case management in a community setting. Their risk of recidivism is further reduced after successfully completing a outpatient sex offender treatment programs. Regardless of treatment, the recidivism risk for child pornography offenders continues to diminish over time, as evidenced by offenders' sexual recidivism rates measured at 10- and 15-years post-release. Offenders who have refrained from sexual re-offense after 15 years show a minimal recidivism risk at the same level found among the general non-offending population (i.e., 0 to 1%). Their low risk profile has also been shown in the literature to be feasibly managed with community supervision.

*Mr. Marvin would benefit from participation in a Non-residential Sex Offender Treatment Program (SOTP-NR)* during his term of incarceration. This examiner endorses this recommendation initially proposed by U.S. Probation in the PSR Report. Mr. Marvin's offense profile matches those of other participants who typically have a history of a single sex crime and are first-time inmates serving a sentence for an internet-related sex offense.

*While incarcerated, Mr. Marvin may also benefit from Dialectical Behavior Therapy individual or group services to help him develop healthy coping skills* and emotional self-regulation. He has been diagnosed with depressive disorder while in DC Jail for which he currently receives psychotropic medication by prescription. DBT group and individual modalities may help him better adjust to prison life and eventually transition back to community supervision after release.

*Ongoing psychiatric medication management services are also recommended for Mr. Marvin.* He may benefit from pharmacotherapy to help him modulate his emotional distress, alleviate intrusive symptoms and agitation to better function in the prison environment.

*Neuropsychological assessment for Mr. Marvin is recommended to rule-out presence of traumatic brain injury* since his history of past head injuries warrants further medical investigation. If necessary, Mr. Marvin should be offered access to any recommended treatment services available through the Federal Bureau of Prisons while he is incarcerated.

*Mr. Marvin has expressed interest in participating in Alcoholics Anonymous or similar 12-step recovery groups related to his past alcohol use problems.* He may benefit from access to such group programs to foster peer social support and practice interpersonal and problem-solving skills.

*Once released, Mr. Marvin should continue with a comprehensive outpatient sex offender treatment program* sponsored through U.S. Probation or another Certified Sex Offender Treatment Provider to help him maintain safe behavior and coping skills learned through the SOTP-NR and other prison-based mental health programs.

*Mr. Marvin could be safely maintained on community supervision after release given his low estimated risk of sexual recidivism.* Recidivism risk levels continue to decrease among most online offenders who successfully complete sex offender treatment.

**Management Recommendations**

*Upon release, Mr. Marvin should have his Internet access restricted while under Court supervision.* Internet privileges may be gradually phased in over time during the later phases of his supervision to foster his responsible internet use in the future.

Thank you for the opportunity to assist the Court in its deliberations.

Respectfully,

Darren C. Brennan, PsyD, CSOTP
Licensed Clinical Psychologist
Certified Sex Offender Treatment Provider
Brennan Institute for Mind-Body Healing